## HELSEL v. PENNSYLVANIA R. CO.

### Civ. No. 8746.

United States District Court
E. D. New York.
June 14, 1949.

Morris A. Wainger, New York City (William Paul Allen and Morris A. Wainger, New York City, of counsel), for plaintiff.

Conboy, Hewitt, O'Brien & Boardman, New York City (Frederick vP. Bryan, New York City, of counsel), for defendant.

BYERS, District Judge.

This is a motion for a new trial because of alleged error in the charge, and in the alternative for the reason that the verdict is excessive.

The first point turns upon the use of the expression "He (the engineer) had to be right about that (receiving a 'go-ahead' signal from the plaintiff brakeman) and if he wasn't right about it then the railroad was negligent."

This somewhat colloquial form of expression lends itself perhaps to misinterpretation, when removed from the testimony in the case, and the charge as a whole. Of course it was not intended to state the Court's view of the law in the abstract, or of any circumstances other than those presented by this record.

Here was a heavily laden train of about 86 coal cars held at rest by the air-brakes of

the engine and the train, on a descending grade of 1.47, which was about to move ahead. In order to accomplish that, retaining valves controlling the air-brakes on some of the cars had to be put down to alter the air pressure. The plaintiff was engaged in that task to the knowledge of the engineer, at a distance back of about 30 cars or 1,200 feet; the engineer was looking in that direction from the gangway of the engine for a go-ahead signal from the plaintiff, having already blown a 4-blast whistle to recall the rear-end brakeman, who had taken his station to protect the rear of the train.

The return of the latter to the caboose would be signaled by the conductor to the plaintiff, and it was the duty of the latter to relay that signal to the engineer, but not until the plaintiff had released an adequate number of the retainer valves.

The testimony of the engineer was so equivocal as to what he saw when looking for the signal, and the side from which he made whatever observation he did make (see Minutes pp. 268–280), as to emphasize the requirement of certainty upon his part as to the nature of the signal that he was to act upon in moving the train ahead. The day was not bright "Sort of a hazy day. It wasn't to say clear. It was a little vague."

In this setting and having in mind the testimony and demeanor of the witness, I believed then and believe now that, if the engineer chose to start his train only having seen a "glimpse of the hand up and down. That is when I got it. And that I took for a signal to proceed" (p. 248), he assumed the full responsibility of interpreting correctly what he says he saw; that if his opportunity to observe was restricted, or if he acted upon less than a clearly discerned and proper signal under the rules, the responsibility for any mishap thereby occasioned must be visited upon the employer. Instead of indulging in so extended a discourse, I employed the term now criticized.

It is urged that the jury should have been permitted to decide whether what the engineer says that he saw, was reasonably to be interpreted as a go-ahead signal, on the theory that only reasonable care was re-quired on the part of the defendant Company. In the presence of clearer evidence of a brakeman's actions as observed by the engineer, such an instruction probably would have been proper. The testimony of this engineer, however, did not present a clear enough picture to the jury to enable it to say what he might be deemed to have observed which led him to conclude that the plaintiff gave him the go-ahead signal.

■ It is not perceived that error was committed calling for a new trial, in the respect now argued.

As to the second branch of the motion, the contentions pro and con are not so simple of resolution. It is not debated that the plaintiff's fall must be deemed to have caused him to fracture 3 ribs (9th, 10th and 11th) and the right transverse processes of the first, second and third lumbar vertebrae. Union of all has been accomplished completely and correctly except for a slight malposition of the second named with some injury to adjacent tissue, muscles and ligaments.

These injuries have caused pain and suffering, and have disabled the plaintiff from performing his duties as a railway brakeman from the time of his accident, November 15, 1947, until the date of the trial, April 21, 1949. At least it must be so assumed for the purposes of this motion, although there is credible medical testimony that he could have resumed his employment about November 1, 1948. As to that, however, he has not been so certified to the defendant.

It is also true that he has not sought any form of physical therapy such as diathermy, massage or the like, which could reasonably be expected to enable him to rehabilitate himself if he were to cooperate.

Certain injuries are claimed to have been demonstrated by opinion evidence, since their assumed presence rests upon the result of testing reflexes and the like. Even the reflexes yielded different results to Doctors Dorian and Feinier on one particular day.

1. Compression fracture of the eleventh dorsal vertebra. Dr. Slater for the plaintiff says the X-rays reveal such a condition, and Dr. Landsman for the defendant reads the

films to the contrary. Dr. Dorian for the plaintiff also read the X-rays in agreement with the former. His testimony on that subject should be compared with the plaintiff's neurologist, Dr. Feinier, who located a possible spinal cord injury as at dorsal eight nerve, not eleven. Nowhere in the medical testimony is there an assertion that this compression fracture, if it ever existed, played any observable part in the pain and nervous conditions of which the plaintiff complains.

2. Intervertebral disc between third and fourth lumbar vertebrae.

Dr. Slater finds a narrowing of the space between these vertebrae, from which he deduces injury to the disc. Dr. Landsman finds no inequality of the space. Since the normal disc is not disclosed on an X-ray film, there is again a conflict in reading. Incidentally, Dr. Dorian says that this injury, which in his opinion is present, is not a material cause of spasm; "It might cause some but not much".

At most, the testimony for the plaintiff points to the possibility of such an injury in explanation of the plaintiff's pain in his lower back.

3. Nerve and spinal cord injury.

This again is a subject which lies in medical opinion based largely upon observation of the reflexes.

Dr. Feinier for the plaintiff spoke of "traumatic implications" in reference to the spine, and used this significant expression in connection with the plaintiff's nerves: " * * * he showed nervous tension, complained of nervous symptoms, and I felt that there were superimposed psychogenic factors."

The American Illustrated Medical Dictionary (1940) defines "psychogenic" as "originating in the mind; psychic".

■ Webster's International Dictionary says: "psychogenic—originating in the mind; caused by or dependent upon, mental influences; as psychogenic nervous disorders as opposed to organic". Since this is a technical expression, familiarity with its meaning cannot be attributed to the jury, or the implications of this particular testimony.

It is not presently suggested that the plaintiff's complaint is imaginary, but rather that readjustment and future welfare may be expected to wait upon a constructive attitude of mind on his part.

Dr. Feinier considered that there are present factors which are "prejudicial to his (plaintiff's) chances of symptomatic recovery". This seems to fall far short of suggesting indefinite invalidism, and the doctor has observed in his experience some like cases of complete recovery after a lapse of time and proper adjustment.

The upshot of the medical testimony is that there is no reason to disbelieve the plaintiff's assertions that he suffers back pains, although he conceded the possibility of having stated to Dr. Hull in October of 1948 that they come only at times of fatigue, and that limitation of his back motion was improving with exercise.

The plaintiff is a young man of 24, not a malingerer, but has perhaps not sufficiently realized that his future earning capacity and physical welfare can be very substantially promoted by proper therapy and a constructive approach to all his problems. When he was on the witness stand, he revealed a capacity to forget himself and his symptoms which bodes well for his future.

The plaintiff's loss of earnings at the rate of about $3,500 a year, from the date of his accident to the date of trial, comes to about $5,000. The verdict, which included an allowance for pain and suffering and future loss of earning capacity, was in the sum of $44,000, and the difference of $39,000 is thought to be contrary to the evidence which has been discussed, as to the element of rehabilitation which is concededly to a great extent in the plaintiff's own hands.

The function of the Court in such a case has been so completely discussed in the opinion of Judge Delehant in Rice v. Union Pacific R. Co., D.C., 82 F.Supp. 1002, as to render superfluous any attempt to further illuminate the subject. Cognate cases in this Circuit are Burris v. American Chicle Co., 2 Cir., 120 F.2d 218, and Brennan v. Baltimore & O. R. Co., D.C., 33 F. Supp. 158.

See also, for discussion, Virginian Ry. Co. v. Armentrout, 4 Cir., 166 F.2d 400, at page 408.

 This plaintiff's injuries were painful and temporarily disabling, but are clearly established only to the extent of the fractured ribs and transverse processes, which have healed. The pain and suffering should be compensated for on a compensatory, not a punitive, basis. The future loss of earning capacity is problematical, but something should be included to cover its possible presence for a limited time; I think this is a subject which the jury did not grasp despite the testimony in the plaintiff's case.

▮ The motion for a new trial will be granted unless the plaintiff stipulates to reduce the verdict by 25%, to the sum of $33,000.

Settle order.